DECISION
Defendant-appellant, Cathy Doerman, appeals a decision of the Butler County Court of Common Pleas, Domestic Relations Division, settling custody and property issues in a divorce action.
Cathy Doerman and plaintiff-appellee, David Doerman, began dating in 1989 and were married in 1994. Mrs. Doerman had two children, Heather and Michael, from a previous marriage. At the time the parties began dating, the children were two and four years old, respectively. In August 1995, Mr. Doerman adopted both children. After experiencing difficulties in their marriage, the parties separated in February 1998. Attempts to obtain a dissolution failed. In November 1998, Mrs. Doerman moved from Butler County to Summit County, taking the children with her. Mr. Doerman filed for divorce on November 19, 1998. Pursuant to Local Rules, Mrs. Doerman was designated residential parent and legal custodian of the children during the pendency of the proceeding. Mr. Doerman was to have "Schedule B" visitation with the children.
The events that followed degenerated the situation into what quickly became a contentious custody proceeding. Mrs. Doerman and the children began seeing counselors to whom she made allegations that Mr. Doerman had abused the children. In late December 1998, she told Summit County Children's Services that Mr. Doerman was abusing the children. Mrs. Doerman obtained an ex parte civil protection order from the Summit County Domestic Relations Court on December 23, 1998. However, when a hearing was held on the civil protection order request, the court denied the petition and terminated the ex parte order. The Summit County court found that the request appeared to be precipitated by the divorce action filed by Mr. Doerman and that the request was "merely an attempt to thwart a visitation order issued by Butler County."
The trial court held a scheduling conference and hearing on a motion to restrict visitation filed by Mrs. Doerman. The parties reached an agreement that Mr. Doerman would have restricted visitation that would be reviewed in a month. On review, the court modified the visitation to unsupervised and set forth a specific visitation schedule. The parties reached an agreement on summer visitation on May 25, 1999 and an agreed entry was filed.
On June 21, 1999, Mr. Doerman filed a motion for contempt against Mrs. Doerman alleging that she failed to follow the visitation schedule. A hearing was held on the motion July 23, 1999. Mr. Doerman testified that he had not had visitation with Heather since before Memorial Day weekend. He stated that Mrs. Doerman would bring the children to the designated meeting place and Michael would get out of the car, but Heather would not. He also testified that he did not have all of the scheduled visitations with Michael. He stated that on these instances, he got messages from the children saying they didn't want to come, wanted to spend time with their mother, or that they didn't support "what was going on in the situation" and weren't going to come on visitation. Mr. Doerman also alleged that when he requested information about an All-Star soccer game his daughter was playing in, Mrs. Doerman refused to give him the information and responded that Heather would have to invite him. He stated that he received this type of response on multiple occasions and in multiple situations.
Mr. Doerman also asked the court for a specific counseling order so that he could continue counseling with his children. The children were attending counseling sessions with Dr. Janet Dix, a psychologist who deals primarily with children, adolescents and families. Mr. Doerman attended one session with the counselor and scheduled a series of sessions on Thursdays, during his visitation time, so that he and Heather could work together on their relationship. According to Mr. Doerman, Mrs. Doerman cancelled the sessions, telling him he was not the residential custodian and could not make appointments for the children.
Mrs. Doerman testified that she tried to talk the children into visiting their father, but that it was their choice and she would not force them to go. The court interviewed the children in camera. At the hearing, there was discussion regarding concern by the children because their father was "fighting for custody." Counsel for Mr. Doerman reiterated that she had repeatedly told opposing counsel and the guardian ad litem that Mr. Doerman was not asking for sole custody and was only asking for shared parenting.
On July 23, 1999, based on the evidence at the hearing, the trial court found Mrs. Doerman in contempt for violating the court's visitation order, but stayed a 30-day sentence. The trial court stated that the children did not have a choice, that they would go to visitation with their father and that Mrs. Doerman would order them to go in the same manner she would order them to go to school if they did not want to go. The trial court also ordered that counseling sessions were to be on Thursdays or Mondays when Mr. Doerman had visitation and was residing in Summit County.[1] The court also ordered that Mr. Doerman was to receive all information regarding the children's activities.
From August through October, Mr. Doerman and Heather met with Dr. Dix on a weekly to biweekly basis. According to Dr. Dix, during this time, visitation went smoothly. On October 24, 1999, an incident occurred which caused the parties to file opposing motions. Mr. Doerman was taking a friend of Heather's home and Heather wanted to stay with her friend. Her father denied the request because she had already spent the majority of the weekend with the friend. Heather began cursing at her father, using vulgarities such as "fuck you" and "you're an asshole." According to Heather, her father hit her on the knee after she swore at him. Mr. Doerman denied that he hit Heather. After returning to Mr. Doerman's, Heather went to another friend's house and refused to come back. The police were called and Heather was charged as an unruly child. After this incident, Heather refused to visit her father.
The court found insufficient evidence that Mrs. Doerman willfully refused to allow visitation and denied Mr. Doerman's motion for contempt. The court further found that the incident was the result of Heather throwing a temper tantrum and there was no credible evidence that Mr. Doerman would harm her. Thus, Mrs. Doerman's motion to terminate visitation was denied. The court again ordered Mrs. Doerman to force Heather to attend visitation and counseling with her father.
Thereafter, Mr. Doerman filed several motions for contempt alleging that Mrs. Doerman failed to provide visitation on various occasions. The motions in contempt were scheduled for a hearing on March 9, 2000, but the parties requested a continuance of the hearing in order to try to amicably resolve the issues. The court entered an order continuing the hearing and stating that the parties had agreed that Mr. Doerman's contact with Heather would be determined on the basis of psychologist, Dr. Roger Fisher's, recommendations.[2]
In April 2000, Mr. Doerman filed further motions for contempt for failing to provide visitation and counseling with regard to Heather. On April 18, 2000, the court held a hearing on the previously filed contempt motions that the parties had attempted to settle. The court found Mrs. Doerman in contempt on three instances, but stayed each 30-day jail sentence. The court ordered Mrs. Doerman to serve the previously imposed 30-day sentence for contempt, and ordered that Mr. Doerman be named the temporary residential parent of the children while Mrs. Doerman served the sentence for contempt. Discussions on the record indicate that Heather refused to go with her father, attacked him in the presence of law enforcement officials, and was arrested for domestic violence.
On April 24, 2000, the trial court granted Mrs. Doerman's motion for early release. On April 28, 2000, the trial court heard evidence on the issue of temporary custody pending the final hearing. The trial court took the matter under advisement, and issued a temporary order granting legal custody of Heather to Mr. Doerman and physical custody to Mrs. Doerman. Mr. Doerman retained temporary custody of Michael and Mrs. Doerman received "Schedule B" visitation. The parties were to continue counseling with Dr. Fisher.
On May 26, 2000, the trial court issued a decision on the issue of temporary allocation of parental rights and responsibilities pending the final hearing. After briefly reviewing the events occurring up until the hearing date, the trial court found that "Mrs. Doerman has thwarted, directly and indirectly, all attempts of the Court to ensure the parties' minor child, Heather, has significant and meaningful contact with Mr. Doerman." The court further found that "Ms. Doerman has also, from time to time, failed to provide Mr. Doerman with significant and meaningful contact with Michael." The court found that Mrs. Doerman had continually attempted to control visitation and that it was in the children's best interest to have significant and meaningful contact with Mr. Doerman. The court found that every time counseling with Heather was ordered by the court, Mrs. Doerman terminated counseling or cancelled sessions. The court found this continued pattern of sabotaging counseling disconcerting.
The court found that based on Mrs. Doerman's actions, it had two choices: to return the children to Mrs. Doerman and let the pattern of conduct continue, or to take another approach. The court determined that, if it were to adopt the first approach, it could not foresee any meaningful contact occurring between Heather and Mr. Doerman and, based on previous history, any meaningful progress would be soon destroyed.
The court found Mrs. Doerman's arguments regarding Mr. Doerman's ability to parent the children baseless. The court further found that, throughout the entire case, Mr. Doerman "has demonstrated a genuine concern and feelings for the children" and "has continually maintained and complied with the orders of the Court." The court reviewed the statutory factors and ordered that Mr. Doerman be named legal custodian of Heather with Mrs. Doerman retaining physical custody. Mr. Doerman was to have contact with Heather one hour per week for lunch or dinner. Mr. Doerman was named residential parent of Michael with Mrs. Doerman receiving visitation. The parties were ordered to continue counseling with Dr. Fisher, and Mrs. Doerman was ordered to facilitate counseling with Heather.
Final hearings occurred on several dates, including July 17, 18, 20, 24 and 25, 2000, September 7, 2000, and January 4, 2001. After the final hearings, but prior to any decision, Mrs. Doerman filed a motion for reallocation of temporary custody, and Mr. Doerman filed a motion in contempt. The motions were heard at an emergency hearing. Evidence presented at the hearing established that Mr. Doerman and Michael discussed the possibility of moving to Butler County and, in the process, looked at housing opportunities, reestablished contacts with Michael's friends, and contacted schools regarding academics and sports opportunities. In a counseling session, Dr. Fisher spoke with Michael about the move. Dr. Fisher testified that Michael was looking forward to the move. Although apprehensive about his mother's reaction, Michael believed Mrs. Doerman would be angry at first, but in the end would work it out.
Shortly before the move, Mr. Doerman took Michael for visitation with Mrs. Doerman. While with his mother, Michael called the guardian ad litem and told him he did not want to move to Butler County and wanted to live with his mother. The guardian stated that the call sounded like it was made on a car phone with Mrs. Doerman in the background. Based on his therapy with the family, Dr. Fisher testified that he believed Mrs. Doerman was forcing Michael to make the call as an attempt to demand loyalty from her son.
The court looked at the continuing pattern of interference and escalation of issues related to Mrs. Doerman's attempts to terminate Mr. Doerman's custody of Michael. These attempts included legal maneuvering in another forum. This occurred most recently when Mrs. Doerman filed a petition for a writ of habeas corpus in Summit County which, when dismissed, she requested to be changed into a complaint for dependency and neglect. The court looked at ongoing interference with school and sporting activities, and a pattern of contacting the police. The court also looked at what it considered an escalation of aggression on the part of Mrs. Doerman, culminating in a threat of physical violence against Mr. Doerman in the presence of a professional at Summit County Children's Services.[3] The court was unable to interview Michael because Mrs. Doerman's whereabouts with the children were unknown. Based on the evidence, the court denied Mrs. Doerman's request for reallocation of custody.
After the emergency hearing, further developments occurred. Mrs. Doerman, although aware of the court's orders, refused to return Michael. This caused the court to issue an order that the Summit County Sheriff's Office take custody of Michael and release him to the guardian or Mr. Doerman. The order stated that Mrs. Doerman was to have no contact with Michael.
In a decision filed March 1, 2001, the trial court addressed the issue of final allocation of parental rights and responsibilities. The court reviewed the lengthy and protracted history of the case and found the testimony of Dr. Dix of utmost importance in reaching its decision. Based on all the evidence, the trial court determined that Mr. Doerman should be named legal custodian of Heather with Mrs. Doerman retaining physical custody. Counseling was ordered to continue with Dr. Fisher. Mr. Doerman was named residential parent of Michael. Mrs. Doerman was to have no contact with Michael, other than in counseling sessions. On September 4, 2001, the trial court entered a judgment entry and decree of divorce. In its final appealable order, the court ordered child support payments and a division of the parties' property.
Mrs. Doerman now appeals various aspects of the trial court's decision. We begin our discussion by noting that Mrs. Doerman filed a pro se brief that contains 32 assignments of error and which, in numerous ways, does not comply with the appellate and local rules.[4] Although it is within the power of this court to strike appellant's brief as urged by counsel for Mr. Doerman, this court has carefully considered the issue and determined that, due to the volatile nature of the issues presented in this custody dispute, addressing the issues raised may serve the litigants' best interest. This court is hopeful that appellate consideration of these arguments may serve as a vehicle to lend some degree of finality to this protracted and bitter custody dispute.
As mentioned above, appellant's brief contains thirty-two assignments of error. We have carefully reviewed all of the arguments raised by Mrs. Doerman. In the discussion that follows, we have grouped the arguments that are reviewable by this court into the headings below.
 Custody Decision
The majority of Mrs. Doerman's assignments of error in some way relate to the trial court's decision regarding custody of the parties' children. In her brief, Mrs. Doerman requests that we return custody of the children to her. We begin by recognizing that custody decisions "are some of the most difficult and agonizing decisions a trial judge must make." Davis v. Flickinger, 77 Ohio St.3d 415, 418, 1997-Ohio-260. Accordingly, a trial judge must have wide latitude in considering all the evidence before it, and such a decision must not be reversed absent an abuse of discretion. Id. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
While a trial court's discretion in a custody proceeding is broad, it is not absolute. The trial court must follow the procedure outlined in R.C. 3109.04. When making an initial allocation of parental rights and responsibilities, the primary concern of the trial court is the children's best interest. R.C. 3109.04(B)(1). The trial court must consider all relevant factors related to the children's best interest, including the following factors specified by R.C. 3109.04(F)(1):
 "(a) The wishes of the child's parents regarding the child's care; (b) If the court has interviewed the child in chambers * * * regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court; (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) The child's adjustment to the child's home, school, and community; (e) The mental and physical health of all persons involved in the situation; (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; (g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor; (h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * *; (i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; (j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."
In making a final custody determination, the trial court found the testimony of Dr. Dix of "utmost importance in reaching its decision." Dr. Dix stated that she could not give a professional opinion on the best interest of the children at the time of the hearing because it had been almost a year since she treated the family. Instead, she discussed her opinion as of the time treatment ended. At the hearing, Dr. Dix testified that when she was treating the family, Mrs. Doerman demonstrated a moderate level of parental alienation syndrome. Dr. Dix testified that in a moderate case, the parent's healthy psychological bond with the children is compromised by rage. The children form an alliance with one parent and have campaigns of deprivation against the other parent, which they are more likely to give up when left alone with the other parent. In this case, Mrs. Doerman's anger with Mr. Doerman affected the children's relationship with their father. Heather formed an alliance with her mother that she was more likely to give up when she was alone with her father.
Dr. Dix discussed the symptoms that occur when severe parental alienation syndrome occurs. She stated that the mother is often fanatic, using every mechanism at her disposal, legal and illegal, to prevent visitation. She stated that they are obsessed with antagonism toward their husbands and do not respond to logic, confrontation with reality, or appeals to reason. The children are similarly fanatic, joining together to share the mother's paranoid fantasies about the father. If placed in the father's home, they may run away or be paralyzed by fear.
Dr. Dix testified that, in moderate cases, treatment involves keeping children with the mother and forcing development of a good relationship with the father. In severe cases, the children should be removed from the mother because there is no way to have a healthy relationship with the father otherwise. Dr. Dix stated that in moderate cases where a court has ordered treatment and visitation, but the mother continues to sabotage the relationship, the next step is to remove the children from the offending parent.
The trial court found that although the situation was moderate when Dr. Dix was counseling the family, it had now progressed to severe. The trial court stated that it had attempted to work with the Doerman family to maintain custody with Mrs. Doerman while ensuring parenting time with Mr. Doerman, as the court believed this was in the best interest of the children when the case originated. The court found that "over the last two years, the Court has watched Mrs. Doerman thwart every attempt of the court to ensure Mr. Doerman's parenting time."
The court discussed the steps taken by Mrs. Doerman to destroy counseling and her failure to enforce the order requiring parenting time with Mr. Doerman, including the failure to return Michael. The court further discussed how admonitions against such behavior and imposing a jail term did nothing to dissuade Mrs. Doerman. The court also looked at Mrs. Doerman's repeated attempts to remove the case to another forum, her actions of displacing responsibility for Heather's actions onto others and Mrs. Doerman's failure to respond to logic or reason. Based on these factors, the trial court determined that it was in the best interest of the children that Mr. Doerman be named legal custodian of Heather with Mrs. Doerman retaining physical custody. Mr. Doerman was named residential parent of Michael with Mrs. Doerman having no contact with Michael, other than in counseling sessions.
This court has thoroughly reviewed the record in this case, including the various filings and the transcripts of the numerous hearings. Based on our review, we find the trial court's decision was far from an abuse of discretion. It is evident from the record that the trial court repeatedly attempted to work with Mrs. Doerman regarding the issue of custody. However, explanations, admonitions, and even jail time failed to dissuade Mrs. Doerman from her belief that it should be up to the children to decide issues of visitation with their father.
Further, even from a review of the record it is evident that Mrs. Doerman repeatedly worked to sabotage any meaningful relationship the children would have with their father. At first these attempts were subtle, such as telling the children they should visit with their father, while also telling them it was their choice. During this time, Mrs. Doerman's words said one thing, while her behavior set a different example. She refused to speak with Mr. Doerman, became upset when he sat anywhere near her at sporting events, referred to him as "Dave" when speaking to the children, and exhibited other negative behavior towards him. Mrs. Doerman refused to provide any type of negative consequence for Heather's behavior when Heather refused to visit with her father. She sought counseling from various counselors, but ended several counseling relationships when suggestions were made regarding her behavior. Mrs. Doerman's negative behaviors continued until Heather's relationship with her father was destroyed and escalated until the point when she refused to return Michael after visitation.
Mrs. Doerman's brief discusses various ways in which she feels Mr. Doerman is unable to parent effectively. We find no merit to these arguments. Mrs. Doerman also argues that "the US [sic] Constitution allows [her] to parent her children, as she sees fit, as long as said parenting is not abusive." We note that generally parenting decisions are free from governmental scrutiny. However, when parties file for divorce, issues of the child's best interest take precedence over what parenting style a parent prefers. In this case, Mrs. Doerman's parenting style of allowing her children to make choices in their own lives was at odds with what was in their best interest: regular visitation with their father. There is no abuse of discretion when a trial court orders a parent to see that visitation occurs, even if that order is in conflict with the party's parenting style.
Although Mrs. Doerman argues that she does not lack insight as found in the trial court's decision, this court sees this as the paramount problem in this case. From the inception of this case, Mrs. Doerman was unable to see how her anger and rage at Mr. Doerman affected the children's relationship with their father. She was also unable to understand that due to the divorce action changes in parenting time and style were required. Although in many of her arguments, Mrs. Doerman claims that everything was done out of the children's best interest, she fails to see how her actions have actually harmed the children and her, to the point where she no longer has contact with her son. Accordingly, we find no abuse of discretion in the trial court's decision allocating parental rights and responsibilities.
 Bias of the Trial Judge
Mrs. Doerman alleges that the trial court was biased and prejudiced against her. During the course of this litigation, she filed two separate requests to have the trial judge disqualified from the case. On November 5, 1999 and December 7, 1999, Chief Justice Thomas Moyer found no bias, prejudice or disqualifying interest, and denied the disqualification requests. Mrs. Doerman also filed a recusal request with the trial court, alleging that the personal friendship of the judge with Mr. Doerman's attorney was hindering her rights to a fair and impartial trial.
We begin by noting that the Chief Justice of the Ohio Supreme Court or his designee has exclusive jurisdiction to disqualify a common pleas judge on the grounds of bias or prejudice. Section 5(C), Article IV, Ohio Constitution; R.C. 2701.03. Beer v. Griffith (1978),54 Ohio St.2d 440, 441-42. Thus, we are without jurisdiction to rule on any issues of disqualification. Id.
We also find no merit to Mrs. Doerman's arguments that the trial court's various decisions were the result of prejudice and bias. A trial judge is presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity. Okocha v. Ferenbacher (1995), 101 Ohio App.3d 309, 322; Statev. Wagner (1992), 80 Ohio App.3d 88, 93. Mrs. Doerman repeatedly refers to the trial judge's "best friend" relationship with Mr. Doerman's counsel. This argument is the result of a conversation after a hearing in which one of Mrs. Doerman's former attorneys commented on the "best friend" relationship of Mr. Doerman's attorney with the judge. Mr. Doerman's attorney immediately requested to go back on the record to discuss the issue. The trial judge admonished counsel that she had been a police officer for four years, spent seven years in private practice and had numerous friendships of varying levels with attorneys in the area. The judge continued by stating that she does not make decisions based on friendships, but decisions are based on the facts presented, and her written opinions contain the reasons for making decisions.
As mentioned above, the trial court's decision in this case was not an abuse of discretion. The reasons for the decision were thoroughly explained in an extensive, detailed, 42-page decision. Instead, the record shows the trial court's ability to be familiar with people in the courtroom, yet remain fair and impartial by making rational decisions based on the law and the facts in the case. See State v. Lewis, Montgomery App. No. 18735, 2001-Ohio-1460. We have reviewed the various other issues and comments raised by Mrs. Doerman and find no merit to her argument that the trial court was biased or prejudiced against her. Although the court at times expressed frustration over Mrs. Doerman's repeated inability to follow the court's orders and facilitate visitation, and her increasing antagonism toward Mr. Doerman throughout the case, the judge was able to remain impartial and did not base its decision on bias or prejudice. See Tandon v. Tandon, Jefferson App. No. 00-JE-16, 2001-Ohio-3157.
Mrs. Doerman further argues that the trial judge's voluntary withdrawal from the case is proof of her arguments. Again, we disagree. The trial judge presided over this protracted, contentious dispute for over two years. During this time, the judge listened to repeated disputes by Mrs. Doerman on a number of issues and endured numerous attacks on her integrity. The judge's eventual withdrawal alone is not evidence of bias or prejudice sufficient to rebut the presumption of integrity. State v.Kilburn (Mar. 30, 1998), Warren App. No. CA96-12-130.
Mrs. Doerman also argues that the trial court had numerous ex parte conversations with the juvenile court, court security, the guardian ad litem, and counselors. In general, a judge should "neither initiate nor consider ex parte or other communications" in a case. Canon 2 of the Code of Judicial Conduct. However, nothing in the judicial code "preclude[s] a judge from non-substantive ex parte communications on procedural matters affecting prompt disposal of the business of the court." Having reviewed the transcripts and file in this case, we find that the trial court did not act improperly.
Finally, Mrs. Doerman argues that the trial court testified during several hearings. Evid.R. 605 states that "[t]he judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." She refers to comments made by the trial court that it was concerned that she had moved to Akron with the children when this fact is not in evidence, discussions by the trial court regarding Heather's arrest for domestic violence when the facts were not specifically testified to, testimony about a conversation which was stricken from the record,[5] and other various issues. However, these instances do not equate to the trial court testifying and giving evidence on issues in which it has "personal knowledge of disputed evidentiary facts concerning the proceedings." See Code of Judicial Conduct, Canon 3. Many of the statements were not disputed by the parties and were used to clarify discussions that occurred prior to the hearings, involved procedural matters, or were not relevant to the trial court's ultimate resolution of issues.[6] These statements are not equivalent to witness testimony.
 Transcripts
Mrs. Doerman raises several arguments regarding the transcripts of the hearings in this case. She argues that they are incorrect and incomplete, and that she requested a hearing to clarify the transcripts. However, she failed to fully avail herself of the procedures provided in the appellate rules for unavailable transcripts and correction of the record. When transcripts are unavailable, App.R. 9(C) provides as follows:
 "If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee no later than twenty days prior to the time for transmission of the record pursuant to App.R. 10, who may serve objections or propose amendments to the statement within ten days after service. The statement and any objections or proposed amendments shall be forthwith submitted to the trial court for settlement and approval. The trial court shall act prior to the time for transmission of the record pursuant to App.R. 10, and, as settled and approved, the statement shall be included by the clerk of the trial court in the record on appeal."
App.R. 9(E) provides the procedure for correction or modification of the record and states as follows:
 "If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the trial court, either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the court of appeals."
Mrs. Doerman failed to follow this procedure. She argues submitted evidence was omitted from the record, but did not provide a copy of this to the trial court in order to have the record corrected. She argues comments made prior to the hearing were not transcribed, and part of a transcript contains "not audible." Although only a small potion was inaudible, Mrs. Doerman failed to follow the proper procedure to supplement the record. She further alleges in her brief that the judge concealed motions and transcripts and tampered with the file. She also alleges that ex parte conversations were recorded and she can only clarify the record by calling the participants as witnesses.
At a hearing on July 17, 2001, the court discussed the various pending motions filed by Mrs. Doerman. Mrs. Doerman wanted to have a hearing to review all of the problems with the transcripts. The trial court discussed scheduling the hearing on September 5 and 6. Mrs. Doerman argued that the court was depriving her of a hearing because she wanted the issue heard immediately. She also argued that the September date would be too late for her appeal. The record contains a notice that the hearing was later rescheduled to another date. No further evidence is contained in the record before us regarding correction of the record.
It is Mrs. Doerman's responsibility to provide us with a record that is adequate to support any claimed errors. Universal Bank v. McCafferty
(1993), 88 Ohio App.3d 556. It is unclear if Mrs. Doerman's motion was specifically ruled on. If the trial court denied or failed to rule on Mrs. Doerman's motions, she could have filed a motion before this court to have the record corrected. State ex rel. Hunter v. Cuyahoga CountyCourt of Common Pleas, 88 Ohio St.3d 176, 177, 2000-Ohio-285.
Furthermore, we find that even if Mrs. Doerman had properly raised these issues, and the transcripts had been corrected to reflect the allegations in her brief, Mrs. Doerman's arguments still fail to evidence prejudice in the trial court's decision. The failure to provide a complete transcript does not always deny an appellant an effective appeal. State v. Nichols (Mar. 2, 2000), Cuyahoga App. No. 75605, 75606. Many of Mrs. Doerman's arguments, including those regarding ex parte communications, are merely general assertions that the record is incomplete or incorrect, and do not demonstrate prejudice. Any material alleged missing or incorrect must have been utilized by the trial court in making its decision. See McGeorge v. McGeorge (May 22, 2001), Franklin App. No. 00AP-1151. As such, this court finds the record before it is adequate for review. See Nichols. As previously mentioned, the trial court's decision discusses the evidence relied upon and Mr. Doerman's arguments, even if substantiated, would not change our determination that the decision was not an abuse of discretion.
 Failure to Transfer the Case to Juvenile Court
Heather was charged with delinquency in Summit County for unruliness and in Butler County for domestic violence. After each of these charges, Mrs. Doerman requested that the trial court transfer jurisdiction of the custody issue to each of these courts. The trial court denied the requests. Mrs. Doerman argues that, pursuant to In rePoling, 64 Ohio St.3d 211, 1992-Ohio-144 and In re Stacie MarieHollaender (June 29, 2000), Warren App. No. CA99-08-092, jurisdiction should have been transferred to the juvenile court. However, both of these cases merely recognize the jurisdiction of the juvenile court in custody matters, and do not mandate the result urged by Mrs. Doerman.
We have recognized that "a court which obtains jurisdiction over and enters orders with regard to the custody and support of children retains continuing and exclusive jurisdiction over such matters." Clermont Co.Dept. of Human Services v. Walsson (1995), 108 Ohio App.3d 125, 128. Thus, the domestic relations court had jurisdiction over the custody and support issues in this case. In addition, the Ohio Revised Code grants jurisdiction to the juvenile court to determine "the custody of any child not a ward of another court of this state." R.C. 2151.23(A)(2). Thus, the juvenile court had jurisdiction to determine custody matters as well. The Ohio Supreme Court has recognized the grant of jurisdiction to the juvenile court as existing concurrent to the jurisdiction of the domestic relations court when a divorce proceeding is involved. In rePoling, 64 Ohio St.3d at 215.
Accordingly, both courts had concurrent jurisdiction to determine custody matters and the court was not required to transfer the case to the juvenile court. Custody matters regarding Michael would remain in domestic relations court. In addition, pursuant to R.C. 2151.23, the juvenile court did not have jurisdiction over support issues, as it can only determine support issues if "the request is not ancillary to an action for divorce, dissolution or marriage, annulment, or legal separation * * *." R.C. 2151.23(A)(11). Thus, factors of judicial economy would indicate the domestic relations court was the best forum to try all issues related to the divorce action, including custody. We find no merit to Mrs. Doerman's argument that the trial court should have transferred jurisdiction to the juvenile court.
 Failure of the Trial Court to Award Attorneys Fees
Mrs. Doerman next argues that the trial court erred by failing to award attorneys fees to her. It is well-established that an award of attorney fees is within the discretion of the trial court. Rand v. Rand (1985),18 Ohio St.3d 356, 359. Accordingly, a trial court decision regarding an attorney fee award will not be disturbed unless it is unreasonable, arbitrary, or unconscionable. Dunbar v. Dunbar, 68 Ohio St.3d 369, 371,1994-Ohio-509.
R.C. 3105.18(H) governs the award of attorney's fees at any stage of divorce or legal separation proceedings. According to this provision, the court must determine whether either party will be prevented from fully litigating his or her rights and if that party's rights will be adequately protected without an award. The party seeking an award of attorney fees must demonstrate (1) some financial need for the award, and (2) that the demand for attorney fees is reasonable under the circumstances. Golick v. Golick, Clermont App. Nos. CA99-05-040, CA99-05-045, 2001-Ohio-8641. The trial court must further find that the other party has the ability to pay the attorney fees awarded by the court. R.C. 3105.18(H). Generally, each party should bear primary responsibility for their own attorney fees, particularly when the party requesting the fees has some ability to pay. Id.
During the course of this litigation, Mrs. Doerman retained the services of four different attorneys. The transcripts reflect that two of the attorneys withdrew from representation because Mrs. Doerman insisted on pursuing the case in a manner the attorneys felt they could not ethically comply with. At the July 14, 2001 hearing, Mrs. Doerman discussed her need for appointed counsel and argued that she had already spent $80,000, and that no one would take her case without a $10,000 retainer.
Mrs. Doerman was gainfully employed during the course of this litigation. For purposes of determining child support, the trial court found Mrs. Doerman's income at $46,350 per year. At one point in the case, the trial court distributed $16,500 from the eventual property settlement to Mrs. Doerman to pay her attorney fees. At one of the hearings, the parties agreed to divide an asset, and Mrs. Doerman received over $20,000 to put toward her legal expenses.
Given these facts, we cannot say that Mrs. Doerman was prevented from fully litigating her rights without an award of attorney fees. She has not demonstrated that she has a financial necessity for an award, nor that the fees were reasonable. Mrs. Doerman has been able to more than adequately litigate her rights and the converse is not true simply because she has not yet been able to obtain the outcomes she desires. Accordingly, we find no abuse of discretion in the trial court's decision that each party pay their own attorney fees.
Mrs. Doerman also argues that the trial court erred in forcing her to proceed at hearings with an "attorney who refused to meet with her, work with her, and based all it's [sic] questions on what the Plaintiff's [sic] attorney questioned." She further claims her counsel was ineffective. A review of the record shows that Mrs. Doerman's third attorney wanted to withdraw from representation shortly before the final hearing was scheduled, and that Mrs. Doerman did not want the attorney to withdraw. The trial court told the attorney that he was required to continue representing Mrs. Doerman until the court heard Mrs. Doerman specifically tell counsel he was fired. Thus, although Mrs. Doerman now complains that the trial court should not have forced the attorney to continue representing her, the continued representation was at her request. In addition, a complaint of ineffective assistance of counsel is not a proper ground on which to reverse the judgment of a lower court in a civil case where the attorney was employed by a civil litigant.Roth v. Roth (1989), 65 Ohio App.3d 768, 776.
 Determination of Termination of Marriage Date
The trial court found that the evidence revealed the parties divided their financial accounts and began living separate and apart on February 17, 1998. The court used this date as the de facto termination of the marriage.
The phrase "during the marriage" is statutorily presumed to run from the date of the marriage through the date of the final divorce hearing. R.C. 3105.171(A)(2)(a). If, however, the trial court determines that the use of either or both of these dates would be inequitable, then "the court may select dates that it considers equitable in determining marital property." R.C. 3105.171(A)(2)(b). The decision to use another alternative date pursuant to R.C. 3105.171(A)(2)(b) is discretionary and will not be reversed on appeal absent an abuse of discretion. Schneiderv. Schneider (1996), 110 Ohio App.3d 487, 493.
The evidence shows that Mr. Doerman moved out of the marital home on February 17, 1998. At that time, the parties told other people that they had decided to divorce. Shortly thereafter, the parties severed their financial relationship by closing joint accounts and opening separate accounts. Mr. Doerman began voluntarily paying child support to Mrs. Doerman. Based on these facts, the trial court's use of the February 1998 date as the de facto termination of the marriage was not an abuse of discretion.
 Various Other Arguments
Mrs. Doerman argues that the trial court erred by failing to award the children their college funds. In her motion to the trial court on this issue, she states that "the children's college funds were not discussed at trial." Because there was no evidence or decision to review, this assignment of error is without merit.
Finally, we note that Mrs. Doerman has raised various other issues in her brief. Among other things, these issues involve: removal of the GAL; failing to appoint counsel for the children; payment of GAL fees; various issues related to the finances of the parties; child support issues; discussions between the trial court and court reporters regarding giving CD's of hearings to Mrs. Doerman; failure to find Mr. Doerman in contempt; failure to enforce Mrs. Doerman's numerous discovery requests and subpoena requests; commission of real estate sale; and counseling orders. We have carefully considered all of the arguments raised by Mrs. Doerman and find no abuse of discretion by the trial court in making these various decisions.
In conclusion, we find no merit to any of the issues raised by Mrs. Doerman on appeal. The decision of the trial court is affirmed.
Judgment affirmed.
POWELL, P.J., YOUNG and VALEN, JJ., concur.
[1] In order to facilitate visitation and provide minimum disruption to the children's activities, Mr. Doerman rented an apartment in Summit County near the children. He resided in the apartment during his Thursday through Sunday visitation time.
[2] Dr. Dix was unable to continue counseling sessions with the family when Mrs. Doerman withdrew her consent for release of information just prior to the hearing in November 1999.
[3] The record shows that Mrs. Doerman sought help from Summit County Children's Services because she claimed she was unable to buy clothes for Heather. The agency contacted Mr. Doerman who offered to bring clothes that the agency could deliver to Heather. When the agency mentioned this to Mrs. Doerman, she became hostile, refused to calm down and stated that if Mr. Doerman tried to bring clothes for Heather, she would "shoot to kill." The agency contacted the sheriff's office regarding the threat.
[4] Mrs. Doerman's request to extend the page limit of her brief, "up to 300 pages" was denied by this court.
[5] This conversation occurred after the judge left the room and recording equipment was left on. Mrs. Doerman requested the conversation be stricken from the record. At a later hearing, the trial court's comments indicate this conversation included references by Mr. Doerman to the fact that he was looking for a house in Butler County. Mrs. Doerman disputes that the conversation does not contain what the court, Mr. Doerman and his attorney stated at the later hearing.
[6] For example, whether or not Mrs. Doerman had prior notice that Mr. Doerman intended to move to Butler County was irrelevant in the trial court's decision on custody matters.